**M. GOLODETZ EXPORT CORP.,**
**Plaintiff,**

v.

**CREDIT LYONNAIS, a corporation,**
**Defendant.**

**No. 79–03139–AAH(TX).**

United States District Court,
C. D. California.

June 25, 1980.

Harris & Donovan, Los Angeles, Cal., for plaintiff.

Lawler, Felix & Hall, Los Angeles, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER RE SUMMARY JUDGMENT

HAUK, District Judge.

The motion for summary judgment of defendant made pursuant to Rule 56 of the Federal Rules of Civil Procedure, having come on regularly for hearing on June 16, 1980, before the above entitled court, the Honorable A. Andrew Hauk, Judge presiding, notice of such hearing having been duly given, Robert L. Fairman, Esq., of Messrs. Harris & Donovan appearing for plaintiff and Robert Henigson, Esq., of Messrs. Lawler, Felix & Hall appearing for defendant, and such counsel having presented their argument, and the Court being fully advised and having determined that subject matter jurisdiction of the court is founded upon 28 U.S.C. § 1332 and that, as a matter of law, defendant is entitled to a summary judgment, the Court makes its findings of fact and conclusions of law as follows:

### FINDINGS OF FACT

1. Plaintiff is a corporation duly organized and existing under the laws of the State of New York with its principal place of business located in New York, New York.

2. Defendant is a corporation duly organized and existing under the laws of France with its principal place of business located in Paris, France.

3. The amount in controversy exceeds the sum of $10,000, exclusive of interest and costs.

4. Plaintiff is engaged in the business of buying and selling commodities including tallow.

5. Defendant is engaged in the banking business throughout the world including the State of California where it is authorized by the Superintendent of Banks of that State to do, and is and has since 1974 been doing, an intrastate banking business from an office located in Los Angeles, California (the "Los Angeles Branch").

6. During the years 1976 through February of 1979, Thomas P. Gonzalez Corporation, a corporation organized under the laws of the State of California with its principal place of business located in Los Angeles, California ("TPGC"), was a banking customer of defendant's Los Angeles Branch and a commodities customer of plaintiff.

7. TPGC was in the business of buying and selling commodities for its own account throughout the world. In that business, TPGC would from time to time contract to purchase one or more commodities from domestic suppliers, including plaintiff, and contract to sell the commodity or commodities so purchased to a foreign buyer.

8. In a typical commodities export transaction in which TPGC engaged, it required that its foreign buyer furnish a letter of credit issued to TPGC as beneficiary and confirmed by a domestic bank (the "export letter of credit"). Its purpose in requiring an export letter of credit in its favor was two-fold: first, the export letter of credit virtually eliminated any credit risk that TPGC would not be paid for the goods it sold; and second, by granting to defendant a security interest in the proceeds payable under the export letters of credit issued in its favor, TPGC obtained from defendant a line of credit which enabled it to finance its business with borrowed money. Supported by export letters of credit which varied in totals between about $1.5 million and over $25 million, loans varying in amount from about $1 million to $11 or $12 million dollars were made by defendant to TPGC.

9. The export letters of credit were issued by a foreign bank at which TPGC's foreign buyer was a customer and they were then confirmed to TPGC by a domes-

tic bank. Payment of the purchase price owing to TPGC by its foreign buyer was then obtained by presentation to that domestic bank of TPGC's sight draft accompanied by the documents specified in the export letter of credit. The documents so specified invariably included (i) a full set of clean negotiable "on board" bills of lading covering the goods shipped to the foreign buyer, either made or endorsed in its favor, (ii) a superintending report showing the quantity shipped and an analysis of the goods showing their conformity to specifications set forth in the credit, and (iii) TPGC's sight draft and invoice each in the amount of the sales price.

10. Collections under such export letters of credit were made for TPGC through local banks, including defendant's Los Angeles Branch, acting as agent for TPGC. For that purpose, TPGC delivered or caused to be delivered to its bank in Los Angeles the necessary collection documents including TPGC's sight draft and invoice, the negotiable documents of title and the superintending report. The local remitting bank then forwarded for collection TPGC's sight draft and accompanying documents to the domestic confirming bank of the export letter of credit. For its service as remitting bank, defendant made a charge of $15.00 to TPGC.

11. In late 1978 and early 1979, TPGC was beneficiary under a number of different export letters of credit in which defendant had acquired a security interest to secure the repayment of advances made and to be made by defendant to TPGC. All of them were documentary letters of credit requiring substantially the same kinds of documents to be timely presented for payment but with reference to different kinds of commodities, e. g., tallow, sunflower seed oil, cottonseed oil, etc.

12. TPGC had been purchasing fancy tallow in bulk from plaintiff for export since sometime in 1975. Throughout the history of that business relationship, TPGC had contracted through a Chicago tallow broker named John Kirby, Inc. ("Kirby"), who served as the interface between plaintiff and TPGC in the contract negotiations. When the price, quantity, terms and approximate shipment date were agreed upon between plaintiff and TPGC, Kirby prepared a written confirmation of the deal bearing a Kirby assigned contract number and the date the deal was made. A copy of the Kirby contract confirmation was then furnished to each of TPGC and plaintiff. Each such sale contemplated delivery by plaintiff on board a vessel declared or nominated by TPGC at a domestic port within the time frame set forth in the confirmation. Each such sale contemplated plaintiff's furnishing TPGC with quality and weight certificates and a superintending report by an independent inspector or surveyor showing the quantity, quality and loading of the fancy tallow delivered on board the vessel declared or nominated to plaintiff by TPGC. A mate's receipt for the tallow was issued by the receiving mate of the vessel at the time the tallow was loaded on board. That mate's receipt was then exchanged by the freight forwarder for clean negotiable "on board" bills of lading covering the tallow. The freight forwarder then sent that set of bills of lading either to plaintiff or, on plaintiff's instructions, to someone else. At about the same time, plaintiff prepared its invoice to TPGC and its sight draft in the same amount drawn upon TPGC through TPGC's bank. The sight draft and invoice were then set by plaintiff to TPGC's bank for collection.

13. In 1975 TPGC was a customer of Crocker National Bank (Los Angeles) and not of defendant. Plaintiff contends—and defendant does not contest—that, while TPGC was a customer of Crocker National Bank, Crocker was utilized "to handle the documents of sale, i. e., sight draft, invoice and negotiable bill of lading and to collect the purchase price from the ultimate purchaser of the [fancy tallow] and pay [plaintiff] its purchase price" [Plaintiff's Answer to Interrogatory No. 1]. If plaintiff's contention is true, then plaintiff itself furnished to TPGC's bank its invoice, together with the original negotiable bills of lading, superintending report and sight draft, under instructions to release the documents to

TPGC upon payment of the draft; TPGC would then receive the bills of lading and superintending report only after plaintiff's draft had been paid, and TPGC would then use the documents to effect collection through its bank under an export letter of credit issued in its favor.

14. In mid-1976, TPGC moved its banking relationship from Crocker National Bank (Los Angeles) to defendant's Los Angeles Branch. Plaintiff had no written or oral communication with defendant at that or any later time regarding how or in what manner future payments to plaintiff by TPGC might be assured, but plaintiff nevertheless claims to have understood from an oral communication made "by an unknown representative of [TPGC]" to an unidentified representative of plaintiff that plaintiff's sight draft, invoice and negotiable bill of lading "would be placed in the hands of [defendant] and that when [defendant] used the paperwork to receive payment [plaintiff] would be paid" [Plaintiff's Answer to Interrogatory No. 1]. Plaintiff has produced no records of any transaction by which it sold fancy tallow to TPGC in which it conditioned any action by defendant upon any such assurance of payment, except as indicated in Finding of Fact 15 below. Instead, with respect to defendant's request that plaintiff produce all writings relating to "prior said tallow transactions" as alleged in the complaint, plaintiff objected to the production of any records (with the exception only of those produced) because "not relevant or material in the sense used in discovery", i. e., not relevant to the subject matter of the action [Plaintiff's Response to Request No. 1].

15. With reference to every tallow transaction between plaintiff and TPGC since as early as April of 1978, as evidenced by the documents plaintiff did produce responsive to defendant's Rule 34 request and by defendant's own records, plaintiff did not at any time furnish to defendant anything other than plaintiff's sight draft drawn on TPGC through defendant, accompanied by the relevant invoice made to TPGC by plaintiff. At no time after February of 1978 (if, indeed, it ever occurred) did plaintiff condition defendant's activities except by the printed language on plaintiff's form of sight draft, viz., "DOCUMENTS AGAINST PAYMENT ONLY", and at no time after February of 1978 (if, indeed, it ever occurred) did plaintiff ever furnish to defendant any document pertinent to a plaintiff-TPGC tallow transaction other than plaintiff's invoice to TPGC. In every such transaction, so far as anyone can recall and so far as the documents produced or otherwise available to defendant reveal, the documents of title covering the fancy tallow sold and delivered by plaintiff to TPGC in each transaction, and the superintending report, weight and analysis certificates and all other pertinent documents except for plaintiff's invoice and sight draft, were furnished direct to TPGC and not through defendant.

16. In the period after March of 1978 and until the occurrence of the fancy tallow transactions in early 1979 for which plaintiff remains unpaid by TPGC, plaintiff and TPGC engaged in the purchase and sale of fancy tallow evidenced by different drafts issued by plaintiff and furnished by it to defendant without any documents other than plaintiff's invoices to TPGC. In each such instance, defendant notified TPGC of its receipt of the draft and invoice and gave to TPGC what information TPGC's representatives wanted, viz., dollar amount, invoice number, weight, etc. Defendant then held the draft and invoice pending instructions from TPGC or plaintiff. On plaintiff's inquiry of defendant why a given draft drawn on TPGC by plaintiff had not been paid, defendant advised plaintiff of the facts, e. g., that TPGC had not yet made arrangements with defendant to fund the payment or that payment had been arranged and was forthcoming. Payment of a draft drawn on TPGC by plaintiff was made (1) only when defendant had received written instructions from TPGC to pay the draft and (2) only when that written advice included both TPGC's request of defendant for a loan sufficient to fund the payment and indicated a source satisfactory to defendant from which repayment of the loan was to be made.

17. In January of 1979, TPGC contracted to purchase from plaintiff, and plaintiff contracted to sell to TPGC, fancy tallow in bulk for shipment from one or more Gulf ports by TPGC. The contracts were made through Kirby and are evidenced by its brokerage confirmations in writing numbered, respectively, 6650 and 6701. Kirby confirmation No. 6650 dated January 11, 1979, called for delivery of 2,250 metric tons of fancy tallow in the second half of January, 1979, for loading at Harvey, Louisiana, aboard the vessel "GLOBE VENUS" or substitute and with the designated terms of payment to be "Usual" [Exhibit 27]. Kirby confirmation No. 6701 dated January 24, 1979, called for delivery of 2,000 metric tons of fancy tallow in February 1979 for loading aboard the vessel "GLOBE GALAXY" or substitute, and with the designated terms of payment, "Payment is to be made latest 72 hours after presentation of documents" [Exhibit 3]. Neither the contracts nor copies of them were made available, nor were their terms otherwise disclosed, to defendant.

18. Pursuant to Kirby confirmation No. 6650 plaintiff delivered on January 30, 1979, approximately 700 metric tons of fancy tallow at Houston, Texas [Exhibit 30], approximately 1,248 metric tons of fancy tallow on February 7, 1979, at Reserve, Louisiana [Exhibit 34], and approximately 300 metric tons of fancy tallow on February 7, 1979, at Westwego, Louisiana [Exhibit 32], all to the vessel "GLOBE VENUS". Pursuant to Kirby confirmation No. 6701 plaintiff delivered approximately 990 metric tons of fancy tallow on February 2, 1979, at Houston, Texas [Exhibit 5], and approximately 960 metric tons of fancy tallow at New Orleans (Harvey), Louisiana [Exhibit 6], both to the vessel "GLOBE GALAXY." Upon receipt of the tallow on board the vessels, mate's receipts were issued by the receiving mates and superintending reports were prepared by the designated surveyors [Exhibits 7, 8, 37, 38, 39, 45 and 46].

19. Based on that documentation, the freight forwarder prepared tanker bills of lading, each made to the order of TPGC as shipper, and the freight forwarder then held those bills of lading pending receipt of instructions from plaintiff.

20. As each of the tanker bills of lading covering the foregoing tallow deliveries except for the last one boarded on the "GLOBE GALAXY" on February 14 was prepared by the freight forwarder, plaintiff authorized its dispatch direct to TPGC. When TPGC received each such bill of lading, it prepared its own sight draft drawn on its foreign buyer and its own invoice to that buyer. As and when all of the documents necessary to support a documentary demand for payment under an export letter of credit in favor of TPGC were assembled by TPGC, it delivered them in a package to defendant together with TPGC's written request that defendant forward the documents to a designated domestic bank for collection under a specified export letter of credit. TPGC did not advise defendant of the source of the goods covered by any such tanker bill of lading nor whether the goods had been paid for, and nothing in the documentation disclosed those facts.

21. In the performance of its collection function as remitting bank, defendant inspected the documents received from TPGC only for the purpose of determining that they conformed to the requirements of the export letter of credit designated by TPGC. Defendant was at all times until February 27, 1979, unaware of the source of the goods shipped or whether the goods had been paid for. The necessary documents were forwarded by defendant for collection and, when collected, the proceeds were applied for the account of TPGC in discharge of TPGC indebtedness owing to defendant.

22. In order to be paid for the tallow delivered on board the vessels as set forth in Findings of Fact 18 and 19 above, plaintiff prepared five separate sight drafts and invoices, each set bearing date and plaintiff's number and made in the sum and covering the quantity of fancy tallow as set forth after each such date and number as follows:

| Date | Number | Amount | Quantity (M/T) |
|------|--------|--------|----------------|
| 1/31/79 | 3148 | $365,396.87 | 699.964 |
| 2/5/79 | 3154 | 511,555.18 | 991.380 |
| 2/7/79 | 3168 | 156,065.99 | 298.977 |
| 2/7/79 | 3175 | 651,545.26 | 1248.171 |
| 2/14/79 | 3183 | 496,936.38 | 963.055 |

As each set comprising invoice and draft was prepared, it was sent by plaintiff to defendant's Los Angeles Branch. The set numbered 3148 was received by defendant on February 1, 1979, the set numbered 3154 on February 6, 1979, the sets numbered, respectively, 3168 and 3175 on February 13, 1979, and the set numbered 3183 on February 20, 1979. Upon receipt of each such draft and its accompanying invoice, defendant's Los Angeles Branch personnel notified TPGC of such receipt and requested instructions when and how to pay them.

23. On February 14, 1979, TPGC's open account indebtedness owing plaintiff on plaintiffs' invoices Nos. 3148, 3154, 3168 and 3175 aggregated $1,684,563.30. The addition of invoice No. 3183 would have increased that credit exposure to $2,181,-499.68. Notwithstanding that Kirby confirmation No. 6701 called for "Payment . . latest 72 hours after presentation of documents", plaintiff declined to release that bill of lading to TPGC and, instead, telexed TPGC on February 14, 1979, that it was instructing the freight forwarder and surveyor to hold all documents on the February 14 loading of the 963.055 metric tons of tallow aboard the "GLOBE GALAXY" until payment of plaintiff's invoices 3148, 3154, 3168 and 3175 had been made [Exhibits 17, 35 and 47].

24. On February 15, 1979, plaintiff's draft number 3168 in the sum of $156,065.99 was paid on TPGC's instructions to defendant to apply certain collection proceeds made under a vegetable oil export letter of credit and a tallow export letter of credit benefitting TPGC, the originals of which had been delivered to defendant by TPGC.

25. On February 27, 1979, TPGC requested by letter to defendant that defendant advance to TPGC sufficient funds to pay plaintiff's drafts numbered 3148, 3154 and 3175. Defendant declined to make the advances requested for the reasons it had just learned from TPGC that there was a potential unanticipated $2,500,000 liability exposure in an unrelated cottonseed oil transaction, that TPGC had incurred operating losses in the last half of fiscal 1978 of roughly six million dollars and that TPGC had already received credit for the collections made through defendant from TPGC's foreign buyer on account of the resale of the goods which it had obtained from plaintiff.

26. When plaintiff's invoices numbered 3148, 3154 and 3175 remained unpaid, its vice president and general manager, Richard J. Kohler ("Kohler"), elected to go to Los Angeles to meet with TPGC's president, Thomas P. Gonzalez ("Gonzalez"). The meeting occurred in Los Angeles on March 5, 1979, where plaintiff's Kohler was joined by Kirby's John Kirby. At the meeting Kohler demanded payment of $1,528,497.31. Shortly thereafter Kohler solicited Gonzalez' assistance in effecting a resale to a third party of the 963.055 metric tons loaded on February 14 aboard the "GLOBE GALAXY" which was then en route to Alexandria, Egypt. TPGC sent a telex on March 8 to the freight forwarder authorizing it to substitute plaintiff's new buyer, Gersony-Strauss Company, Inc., as the "shipper" on the bill of lading covering the February 14 loading of fancy tallow aboard the "GLOBE GALAXY" [Exhibits 20, 21 and 22].

27. By March 12, 1979, it had become abundantly clear to defendant that TPGC had no source of funds to effect payment of any of plaintiff's invoices Nos. 3148, 3154, 3175 and 3183, unless defendant loaned the funds to TPGC for that purpose. At that date, TPGC owed over $5.5 million to defendant and defendant had decided not to extend any further credit to TPGC. Accordingly, defendant returned the four sets of invoices and sight drafts numbered 3148, 3154, 3175 and 3183 to plaintiff by letter dated March 12, 1979 [Exhibit 24].

28. Plaintiff obtained payment for the resold tallow covered by its invoice number 3183 and, by this action commenced August

17, 1979, seeks to recover $1,528,497.31 representing the aggregate amount of its invoices numbered 3148, 3154 and 3175 plus interest, costs and other claimed damages.

29. On March 21, 1979, plaintiff, through its counsel of record, Harris & Donovan, of 615 South Flower Street, Los Angeles, California, commenced an action in the Superior Court of California for the County of Los Angeles against TPGC, Thomas P. Gonzalez, Glen Powers and fictitious named defendants, seeking to recover from them $1,528,497.31 and interest as compensatory damages and $1,500,000 in punitive damages [Exhibit 63]. By the complaint in that state court action, plaintiff alleged "[t]hat on January 31, 1979, February 5, 1979 and February 9, 1979, pursuant to instructions of defendants, plaintiff by invoice numbers 3148, 3154 and 3175 shipped certain quantities of  .  .  . tallow  .  .  .  to Alexandria, Egypt. .  .  .  [and] that these sales of tallow .  .  .  totaled [sic] $1,528,497.31" [Compl., ¶ 8, pp. 3–4]. That verified complaint further alleged that "invoices and accompanying reports of survey and sight drafts totaling [sic] $1,528,497.31 were furnished to defendant's bank for collection" [Compl., ¶ 8, p. 4] but that Sanford Block, an employee of plaintiff [was induced by false promises and representations of Glen Powers] to depart from the terms of the contract between plaintiff and defendant to send the 'tanker bill of lading' representing title to  .  .  .  [said ?] tallow directly to defendants.  .  .  ." [Compl., ¶ 7, p. 4] and that "Sanford Block in reliance upon the false promises of defendants [TPGC, Gonzalez and Powers] sent said 'tanker bills of lading' to [said] defendants on or before February 9, 1979, and that said defendants resent said documents to Egypt for use by their customers to obtain said tallow in transit" [Compl., ¶ 11, pp. 4–5]. Finally, plaintiff alleged in its verified state court complaint "[t]hat upon release of said documents of title to defendants, plaintiff lost all right to control said tallow's delivery and could not protect itself from loss by the breach of the contract by [said] defendants" [Compl., ¶ 11, pp. 4–5].

30. In the complaint in the instant action, plaintiff alleges in its unverified complaint that it had a "payment agreement between plaintiff and Credit [Lyonnais]  .  .  .  [providing that] the tallow was to be loaded at United States ports in the Gulf of Mexico  .  .  .  and documents of title issued by the carrier to plaintiff's order" [Compl., ¶ 10, 4/16–21], that "Plaintiff was to cause three sight drafts to be prepared  .  .  .  to be directed to Credit [Lyonnais] which would provide that Credit was to pay plaintiff  .  .  .  the sum of $1,528,497.31 at such time as Credit utilized and transferred [sic] the three negotiable bills of lading to ESTRAM.  .  .  ." [Compl., ¶ 10(b), 4/22–27] and that "plaintiff performed all conditions required to be performed by it with regard to the transaction involved herein" [Compl., ¶ 11, 5/5–7].

31. At the time of the preparation and filing of the complaint herein, viz., on and before August 17, 1979, plaintiff knew through an investigation it had made: that the verified allegation contained in its state court complaint that the three negotiable bills of lading represent title to the tallow had been sent directly to TPGC at the instructions of its operations manager, Sanford Block, was true; and that the unverified allegation of the complaint herein that defendant was to pay plaintiff at such time as it "utilized" the three negotiable bills of lading by sending them to TPGC's foreign buyer, was false.

32. At the time of the preparation and filing of the complaint herein, viz., on and before August 17, 1979, plaintiff knew that its former operations manager, Sanford Block, regularly and routinely issued instructions to have negotiable bills of lading covering merchandise sold by plaintiff to TPGC sent direct to TPGC and regularly and routinely sent or caused to be sent direct to TPGC the superintending report and weight and analysis certificates which TPGC needed in order to obtain payment from its foreign buyer.

33. There never was any payment agreement or arrangement between plain-

tiff and defendant as alleged in the complaint and there never were any negotiations for any such payment agreement or arrangement.

34. There never were any promises or representations made by defendant to plaintiff as alleged in the complaint and the only communications ever had between them were inquiries regarding receipt of drafts, their disposition and how and in what form payments from TPGC to plaintiff were to be effected.

35. At the time of the preparation and filing of the complaint herein, viz., on and before August 17, 1979, plaintiff had no reasonable grounds to suspect any collusive and fraudulent conduct between TPGC and defendant, and its allegations to that effect are unsupported by any credible evidence.

36. As a result of its financing the international trade transactions in which TPGC engaged, defendant is now owed the principal sum of $5,628,983.96 plus interest thereon. Of that principal indebtedness, $1,510,933.55 represents amounts advanced by the bank to TPGC to enable its payment of Golodetz' drafts.

37. There is no genuine issue of material fact remaining to be tried or determined herein.

38. Any finding of fact included in the conclusions of law is hereby incorporated herein by reference.

## CONCLUSIONS OF LAW

1. The sale of tallow by plaintiff to TPGC was the sale of goods on open account credit in a transaction wholly independent of TPGC's resale of the same tallow to its foreign buyer.

2. In and before February of 1979, defendant had a perfected security interest in the proceeds payable under the export letters of credit benefitting TPGC which letters of credit had been obtained by TPGC's foreign buyer to assure payment to TPGC for the tallow sold and delivered to it.

3. Defendant's services as a remitting bank in effecting collections under export letters of credit benefitting TPGC imposed upon defendant no duties or obligations to plaintiff, absent any contractual commitment by defendant to or for the benefit of plaintiff.

4. There was no contractual commitment of any kind between plaintiff and defendant, whether by way of guaranty or otherwise.

5. There was no contractual commitment of any kind between defendant and TPGC for the benefit of plaintiff whether by way of letter of credit or otherwise.

6. Defendant owed no duty to plaintiff to continue to make loans to TPGC to enable the latter's payment of plaintiff's drafts drawn on TPGC, owed no duty to plaintiff to inquire whether plaintiff had been paid for the tallow it sold and delivered to TPGC and owed no duty to apply collection proceeds in which defendant had a security interest for the benefit of plaintiff.

7. Any conclusion of law included in the foregoing findings of fact is hereby incorporated herein by reference.

## ORDER RE SUMMARY JUDGMENT

IT IS, THEREFORE, ORDERED that the motion for summary judgment of defendant be and the same hereby is granted, that plaintiff have and recover nothing by its complaint, that the action be dismissed on the merits and that the clerk of the court enter judgment accordingly.